# COURT OF APPEALS OF VIRGINIA

### Record No. 1525-25-3

CURTIS WRIGHT, ET AL.
v.
TYLER PAINTER, ET AL.

Present: Chief Judge Decker, Judges Raphael and White
Argued by videoconference

Opinion Issued June 30, 2026[*]

## FROM THE CIRCUIT COURT OF BOTETOURT COUNTY
Joel R. Branscom, Judge

Charquia Fegins for appellants.

No brief or argument for appellees.

## MEMORANDUM OPINION BY
## JUDGE STUART A. RAPHAEL

Leslie and Tyler Painter (the Painters) purchased a residential property from Curtis and

Venessa Wright (the Wrights). The house had plumbing problems, and the Painters sued the

Wrights for breach of contract and fraud in the inducement. At a bench trial, the court dismissed

the Painters' breach-of-contract claim but found in their favor on the fraud claim. On appeal, the

Wrights argue that the trial court erred in denying their motion to vacate the judgment for the

Painters on the fraud claim.

A buyer cannot prevail on a fraud-in-the-inducement claim based on an allegedly hidden

defect if a reasonably prudent person in the buyer's position would have taken steps to

investigate, and if such an investigation would have uncovered the defect. Likewise, a buyer

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

cannot prevail if he undertakes only a partial investigation when a full investigation would have revealed the defect. Because the trial court erred as a matter of law in failing to apply those rules, we reverse and enter final judgment for the Wrights.

BACKGROUND

We recite the facts in the light most favorable to the Painters, as they prevailed in the bench trial below. *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 (2022). But we review the trial court's application of the law to those facts de novo. *Callison v. Glick*, 297 Va. 275, 288-89 (2019).

*A. The Wrights buy the property, rent it for several years, and make repairs to the plumbing.*

The house at 48 Oxford Circle in Daleville, Virginia was built in 1972. The basement features a laundry room and bathroom. The Wrights bought the property in 2005. After living there for 11 years, they moved to Fredericksburg. From 2016 to 2019, the Wrights rented the Daleville property to various tenants.

One tenant was Josh Harvey. He experienced plumbing problems while living there in 2019. When it rained, the basement floor drains would back up. If he used the washing machine, the shower and floor drains would back up. Harvey told the Wrights about the plumbing problems.

Upon learning that the Wrights planned to sell the property, Harvey offered to buy it at less than the list price on account of the plumbing problems. When the Wrights declined, Harvey moved out. Harvey testified that he ended his lease early because of the plumbing problems.

In November 2019, Jennifer Keller signed a purchase agreement to buy the property from the Wrights. When Keller asked Harvey about the house, he told her about the plumbing

- 2 -

problems he had experienced. Keller asked the Wrights to repair the downstairs plumbing before she invested money in the home inspections; the Wrights agreed.

The Wrights paid JC Plumbing $5,850 to complete those repairs. After the work was completed, the Wrights observed that the concrete had been torn up in the basement bathroom and laundry room. To test the repairs, the Wrights testified that they ran the washing machine, the dishwasher, and the kitchen and bathroom faucets—"everywhere water could come"—and there was no problem with any water backing up in the floor drain or shower.

The Wrights gave the JC Plumbing invoices to their realtor, together with a video filmed during the repairs. The video shows Curtis kicking a drain plug toward a drain and the plumber responding that "he fixed it" and that the plug "don't need to be there no more." The Wrights testified that they believed that JC Plumbing had resolved the plumbing problems. They also claimed that the washing machine was connected to the plumbing before they left the property for the final time.

Keller refused to go through with the purchase, basing her decision on the "issue with the laundry room drain." She did not respond to the Wrights' inquiries about closing and "never talked to them personally." While the property was back on the market, the Wrights allowed realtors and neighbors to view it.

*B. The Painters buy the property and immediately experience plumbing problems.*

In January 2020, the Painters signed a purchase agreement for the property with various inspection contingencies. They completed three inspections in February—a home inspection, a wood-infestation inspection, and an inflow-and-infiltration inspection. The home-inspection clause said that the purpose of the inspection was to discover, among other things, whether the "plumbing" system and "appliances" were "in safe working order." It cautioned that "[t]he fact

that a structural element, system or subsystem is near, at or beyond its normal useful life is not, by itself, a Defect."

To perform their inspection, the Painters hired Sean Osborn, paying him $300. But Osborn's contract with the Painters disclaimed any inspection of any "household appliances" or "overflow drains." Those items (among others) were "excepted from this inspection." Osborn noted in his inspection report, however, that the washing-machine valves were corroded and that he had not tested the floor drains.[1]

The Painters did not request a plumbing-specific inspection and never tested the washing machine or the house drains before closing. Even so, the parties agreed to remove the home-inspection contingency in exchange for the Wrights' paying $300 toward the closing costs. The Painters themselves walked through the property at least twice before closing. During one of those walkthroughs with Leslie's father, Phillip Cullum, the Painters noticed that the washing machine was disconnected from the plumbing.

The Painters' realtor told them that repairs had been made to the home's plumbing, and the Painters were equivocal about whether they had seen a receipt reflecting those repairs. The receipt was entered into evidence at trial.

The Painters never asked the Wrights about the disconnected washing machine. In fact, the Painters never spoke with the Wrights during the transaction. The sale of the property closed in March 2020.

The Painters moved into the home on April 13, 2020. Tyler testified that "just over a week" later, he was running the washing machine, heard a "gurgle" sound from the bathroom, and saw in the laundry room "a dark pool of water around the drain that was coming up as the

---

[1] The trial court excluded the home inspection report but allowed counsel to question the Painters about what had been examined.

washing machine was going through the dump cycle." He added that it was not difficult to reconnect the washing machine; it "was -- like just hooking it up and running it that's all we really had to do to it."

Within two weeks, they noticed gray, standing water at the laundry drain. The Painters called JC Plumbing—the same contractor that had completed the waterline repairs in late 2019. When JC Plumbing snaked the laundry-room drain and cleared the pipes, the plumber discovered a "test ball" inside the pipe. The inflatable test ball stops "water from either going in or going out of a pipe." The Painters told the plumber that they had not put the test ball in the pipe.

Cullum asked another plumber, Randall Webb, to examine the plumbing system. One of the first things Webb noticed was the test ball in the uncovered laundry-room drain. Given the recurring plumbing problems, the Painters submitted a home-warranty claim, leading to a third plumber responding, Turner's Plumbing. The Painters stopped using the basement bathroom, and they alternated using the dishwasher and washing machine to avoid backups.

The plumbing problems continued through September 2020. A fourth company, Wisler Plumbing, identified an exterior pipe connected to the city's water lines that needed replacement. Wisler completed the repair. The downstairs pipes functioned properly for about six weeks until dirty water collected again around the laundry-room drain. Wisler Plumbing returned in December 2020 and ran a camera through the pipes. The footage revealed puddles that "shouldn't be there." Wisler ultimately recommended replacing the entire downstairs plumbing system.

*C. The Painters sue the Wrights for breach of contract and fraud in the inducement.*

In October 2021, the Painters sued the Wrights for breach of contract and fraud in the inducement. The Painters claimed that the Wrights breached the sales contract by denying them reasonable access to inspect the plumbing system during the home inspections. They argued that

the Wrights fraudulently concealed the quality of the pipes to dupe them into buying the property. The Wrights denied those allegations.

While preparing for trial, the Painters retained a fifth plumber, Walker's Plumbing, to assess the plumbing system. Walker ran a camera down the drain and noted backup and debris that had likely accumulated over the years. He recommended replacing the pipes because they could not be fully repaired; the estimated replacement cost was $10,180.90. Walker also opined that the original pipes were made of cast iron and PVC. He agreed that "the integrity of the pipes was compromised due to their ordinary usage and their overall age[.]"

At trial, the parties and witnesses recounted the facts set forth above. At the close of the Painters' case, the Wrights moved to strike both counts.

The trial court granted the Wrights' motion to strike the breach-of-contract claim in Count I. The issue was whether the Wrights' failure to have the washing machine connected breached a provision of the contract that required all appliances to be "in service" at the time of the inspection. The trial court found there was no breach because "all you had to do was plug it in and hook it up." Even if it were a "technical breach," it was not significant "enough" to constitute a "breach of contract." But taking the evidence in the light most favorable to the Painters, the court denied the motion to strike the fraud-in-the-inducement claim in Count II.

In the defense case, Jason Huntley testified as a plumbing expert for the Wrights. He visited the property in June 2023. Huntley ran a camera through the basement pipes system and turned on the water in the appliances, toilets, and sinks. Huntley saw some water rise in the drain but no water backed up. Huntley admitted that he did not run the upstairs dishwasher during that testing. He opined that the main drain had the typical buildup of an older home equipped with cast-iron pipes.

The Wrights confirmed Tyler's testimony that they had never communicated directly with the Painters. The Wrights denied that they had unhooked the washing machine before closing. They also denied placing the test ball in the laundry room drain, saying it had been there since they bought the property in 2005. The Wrights said they believed JC Plumbing had fixed the pipes.

The trial court denied the Wrights' renewed motion to strike the fraud-in-the-inducement claim. After closing argument, the trial court found for the Painters and awarded damages of $10,500.

The court entered an order on February 7, 2025, reciting that it had granted the motion to strike the breach-of-contract claim in Count I. But the order did not actually enter judgment on Count I or dismiss it. The order awarded the Painters $10,500 in damages, prejudgment interest from December 6, 2024, and costs on Count II. It also recited that the Wrights "have requested that this matter remain on the docket for post-trial motions."

Nearly a month later, the Wrights moved to set aside the verdict, arguing that the Painters had presented "no evidence of a false representation let alone clear and convincing evidence of fraud." The Painters responded that the February 7 order had become final under Rule 1:1, so the trial court had lost jurisdiction. They also argued that the judgment was not plainly wrong or without evidence to support it.

The trial court entered a "Final Order" on August 5, 2025. The court found that it still had jurisdiction under "Rule 1:1(e)." The August 5 order said that the court "hereby dismisses Count I with prejudice." The order further denied the Wrights' motion to set aside the verdict and awarded the same judgment as before on Count II. The Wrights noted their appeal on August 28, 2025.

ANALYSIS

The Wrights argue in their sole assignment of error that the trial court erred in denying their motion to vacate the judgment on the Painters' fraud-in-the-inducement claim in Count II of the complaint. The Painters have not appeared here and have not filed a brief.

*A. The Wrights timely appealed from the final order.*

The Wrights do not mention it on brief,[2] but we begin with the Painters' argument below that under Rule 1:1(a), the trial court lost jurisdiction over the case after entering the February 7, 2025 order. The Painters insisted that the February 7 order was the final order because it entered a money judgment in their favor, and the trial court did not suspend, modify, or vacate it within 21 days. The trial court disagreed with their jurisdictional claim, treating the August 5 order as the final order. But if the Painters were correct, then we would lack appellate jurisdiction here because the notice of appeal, filed August 28, was not filed within 30 days of the February 7 order. *See* Rule 5A:6(a). So we start by assuring ourselves of our appellate jurisdiction. *See, e.g.*, *Watson v. Commonwealth*, 297 Va. 347, 352 (2019) ("[T]he lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court sua sponte." (quoting *Morrison v. Bestler*, 239 Va. 166, 169-70 (1990))).

A casual reader might conclude that the February 7 order was the final order. That order recited that the trial court had granted the Wright's motion to strike the breach-of-contract claim in Count I. The order also entered a money judgment for the Painters on Count II. It used final-order-sounding language—"ADJUDGED, ORDERED and DECREED." And although the order recited that the Wrights had "requested that this matter remain on the docket for post-trial motions," that is not enough to negate the finality of an otherwise final order. Indeed "only an

---

[2] We granted leave for the Wrights to file their second amended brief of appellants, which we treat as the operative brief.

order within the twenty-one day time period that clearly and expressly *modifies*, *vacates*, or *suspends* the final judgment will interrupt or extend the running of that time period so as to permit the trial court to retain jurisdiction in the case." *Super Fresh Food Mkts. v. Ruffin*, 263 Va. 555, 563-64 (2002). "Neither the filing of post-trial or post-judgment motions, nor the trial court's taking such motions under consideration, nor the pendency of such motions on the twenty-first day after final judgment, is sufficient to toll or extend the running of the twenty-one day time period of Rule 1:1." *Id.* at 560.

Still, the trial court was right when it cited Rule 1:1(e) to conclude that the February 7 order was not the final order because that order did not dismiss or enter judgment on Count I. Rule 1:1(e) provides:

> *Motions to Strike.* —In a civil case, an order which merely grants a motion to strike, without expressly entering summary judgment or partial summary judgment or dismissing the claim(s) or cause(s) of action at issue, *is insufficient to dispose of the claim(s) or cause(s) of action at issue*.

(Second emphasis added). Subsection e operates very differently from subsection c, which governs demurrers, and subsection d, which governs pleas in bar. As we recently explained in *Hammond-Schrock v. Commonwealth*, 86 Va. App. 780 (2026), the Supreme Court added subsections c and d to Rule 1:1 in 2018 to partially change the rule that prevailed under *Bibber v. McCreary*, 194 Va. 394 (1952). *See Hammond-Schrock*, 86 Va. App. at 790-91. *Bibber* had held that an order sustaining a demurrer was not a final order unless it went further and also dismissed the case. 194 Va. at 395. The 2018 amendments made clear that an order sustaining a demurrer or a plea in bar may qualify as a final order "even if the order does not expressly dismiss the claim(s) or cause(s) of action at issue." Rule 1:1(c), (d). "But the rule in *Bibber* was not superseded as to other orders that fail to 'go further and dismiss the case,'" such as a motion

to strike in a civil case that, under Rule 1:1(e), "is *insufficient* to dispose" of the claim. *Hammond-Schrock*, 86 Va. App. at 791 (quoting *Bibber*, 194 Va. at 395).

The Supreme Court did not explain in its 2018 amendment to Rule 1:1 why it kept the *Bibber* rule for motions to strike in civil cases while changing the rule for orders sustaining a demurrer or plea in bar. Perhaps it was because demurrers and pleas in bar typically address *legal* deficiencies that bar a claim altogether while motions to strike at trial often involve *factual* shortcomings that might be more easily rectified by a motion to reopen. Perhaps it was because orders sustaining demurrers and pleas in bar without also dismissing the case were more common than orders granting motions to strike without likewise doing so. Whatever the reason, the Supreme Court clarified the default rules that apply. And Rule 1:1(e) makes clear that an order granting a motion to strike in a civil case is not final unless it also enters judgment on the claim or dismisses it.[3]

The February 7 order here said that the trial court had granted the motion to strike the breach-of-contract claim in Count I, but the order did not go further to dismiss that claim. Only the August 5 order did that. So the August 5 order was the final order under Rule 1:1(e), and the Wrights' August 28 notice of appeal was timely filed within the 30 days allowed by Rule 5A:6(a).

---

[3] As for criminal cases, *compare* Rule 3A:15(c) ("The court must enter a judgment of acquittal if it strikes the evidence . . . ."), *with Commonwealth v. McBride*, 302 Va. 443, 453 (2023) ("Under Virginia law, the circuit court's verbal pronouncement to grant the motion to strike was not final. The circuit court retained the authority to revisit its earlier ruling, so long as doing so did not offend Double Jeopardy.").

*B. The Painters had inquiry notice of the plumbing problems and cannot claim that they detrimentally relied on any alleged concealment.*

    *1. Inquiry notice can defeat the element of reasonable reliance.*

The Painters argued below that the Wrights intentionally misrepresented and concealed the plumbing defects. To establish fraud in the inducement, a plaintiff must prove: (1) false representation, (2) of a material fact, (3) that induces the contract, (4) on which the other party had a right to rely, and (5) results in damages. *Nestler v. Scarabelli*, 77 Va. App. 440, 463 (2023). Fraud in the inducement must be proved by clear and convincing evidence. *Masche v. Nichols*, 188 Va. 857, 865 (1949). Concealment of a material fact may constitute a false representation. *Van Deusen v. Snead*, 247 Va. 324, 328 (1994). But proof of misrepresentation by concealment requires "evidence of a knowing and a deliberate decision not to disclose a material fact." *Norris v. Mitchell*, 255 Va. 235, 241 (1998).

Virginia generally follows the common-law doctrine of caveat emptor in real-property transactions. *See Kuczmanski v. Gill*, 225 Va. 367, 369 (1983); *but see* Code § 55.1-703 (requiring certain disclosures not applicable here). The buyer bears the burden of inspecting the property to discover defects that would be revealed through ordinary diligence. *See Va. Nat. Gas Co. v. Hamilton*, 249 Va. 449, 456 (1995) ("[T]he doctrine of *caveat emptor* . . . requires a purchaser to use ordinary care in making inquiries and inspecting the premises before contracting to purchase."). "[A] very important exception to that rule is that the seller 'must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination [that] a prudent man ought to make.'" *Armentrout v. French*, 220 Va. 458, 466 (1979) (quoting *Horner v. Ahern*, 207 Va. 860, 864 (1967)).

Still, even if the seller makes materially "'false representations . . . of fact,'" the buyer cannot establish justifiable reliance if known facts would "excite the suspicions of a reasonably prudent man," and the buyer has a fair opportunity to investigate them. *Horner*, 207 Va. at 864

- 11 -

(quoting *Costello v. Larsen*, 182 Va. 567, 571 (1944)). What is more, a buyer who commences an investigation is considered on notice of all facts that a complete investigation would have revealed. *Poe v. Voss*, 196 Va. 821, 827 (1955). Such a buyer "cannot claim that he did not learn the truth, and that he was misled." *Id.* (quoting *W. End Real-Est. Co. v. Claiborne*, 97 Va. 734, 751 (1900)). For "one who seeks to hold another [liable] in fraud must clearly show that he has relied upon the acts and statements of the other. And he must be held not to have so relied when it appears that he has made his own investigation, whether complete or not, into the subject matter at hand." *Harris v. Dunham*, 203 Va. 760, 767 (1962) (citation omitted).

2. *The Painters' failure to conduct a complete investigation defeats their fraud-in-the-inducement claim.*

The record in this case is devoid of any evidence that the Wrights affirmatively misrepresented any facts about the plumbing to the Painters. Indeed, the Wrights and the Painters were never in direct contact. The Painters' theory of the case thus depended on circumstantial evidence that the Wrights had concealed the plumbing conditions to throw them off their guard. *See Van Deusen*, 247 Va. at 329 ("[A]n allegation of concealment by conduct is equivalent to an allegation of a verbal misrepresentation of a material fact, made intentionally to mislead prospective purchasers and to divert them from 'making the inquiries and examination [that] a prudent man ought to make.'" (quoting *Armentrout*, 220 Va. at 466)).

Pointing to the disconnected washing machine, the test ball, and the 2019 plumbing repairs, the Painters argued that they did not "have an equal means" to discover the conditions of the house's plumbing before their purchase. But given that the Painters commenced a home inspection for which the express purpose was to uncover problems with the plumbing and appliances (among other systems), the Painters were charged with all knowledge that a reasonable inspection would have revealed.

- 12 -

As the trial court found when striking the breach-of-contract claim, connecting the washing machine to the plumbing was quite simple. The Painters offered nothing to justify their failure to have run the washing machine before buying the property. They personally walked through the house and saw that the washing machine was disconnected, yet they did not ask about it or bother to test the washing machine themselves. Tyler testified that when he finally ran the washer a week after moving in, it caused "a dark pool of water" to back up around the drain in the laundry room. And Webb testified that the test ball was the first thing he saw when he uncovered the laundry room drain.

The Wrights' disclosure of the plumbing repairs also undercuts the Painters' concealment theory. Concealment is a "deliberate nondisclosure designed to prevent another from learning the truth." *Norris*, 255 Va. at 240 (emphasis omitted) (quoting *Van Deusen*, 247 Va. at 328). Although the Painters were equivocal about whether they had seen the JC Plumbing repair invoices, they knew that plumbing repairs had been made. That fact makes this case analogous to *Watson v. Avon Street Business Center, Inc.*, 226 Va. 614 (1984).

The buyer in *Watson* purchased a warehouse that had suffered roof damage in separate incidents: fire damage one year in the southernmost portion, and wind damage the next in the northwest corner. *Watson*, 226 Va. at 616. While the fire damage was fully repaired, the sellers only temporarily repaired the wind damage, a fact the buyer said had been concealed. The buyer had partially inspected the roof—though not the portion damaged by wind. But he received the sellers' business records, including the receipt for "repair wind damage." *Id.* at 616-17. The Supreme Court held that the trial court erred in failing to set aside the jury verdict for the buyer. The buyer had "ample opportunity to examine the roof directly, but stopped short of examining the area where the wind damage had been repaired although the repairs would have been obvious." *Id.* at 619. The Court added that even after a buyer receives a positive representation

- 13 -

of a material fact from the seller, if the buyer investigates those facts for himself, the buyer is "charged with all the knowledge which he might have obtained had he pursued the inquiry diligently to the end." *Id.* (citing *Poe*, 196 Va. at 826-27).

So too here. The known plumbing repairs, the home inspection report noting that the inspector did not examine the washing machine or drain, and the disconnected washing machine should have put the Painters on notice that further inquiry was warranted. Notably, the Painters obtained the Wrights' consent for a complete home inspection that would have examined the washing machine and drain pipes. But the inspector ended up conducting only a partial inspection because his contract with the Painters did not require him to examine the appliances or drains. The partial inspection that resulted cannot be blamed on the Wrights. Had the Painters simply connected the washing machine and turned it on, they would have discovered the plumbing problems that gave rise to this suit.

CONCLUSION

In short, the trial court erred in failing to grant the Wrights' motion to strike the fraud-in-the-inducement claim and in failing to set aside the judgment.

*Reversed and final judgment.*